# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1204-23

DEPARTMENT OF CHILDREN
AND FAMILIES, DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Petitioner-Respondent,

v.

D.S.,

      Respondent-Appellant.

_____

      Argued May 22, 2025 – Decided June 2, 2025

      Before Judges Mawla, Walcott-Henderson, and Vinci.

      On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Docket No. AHU 15-0470.

      Joshua M. Nahum argued the cause for appellant (Law Offices of Alan L. Zegas, attorneys; Joshua M. Nahum and Alan L. Zegas, on the briefs).

      Wesley Hanna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney

General, of counsel; Joann Corsetto, Deputy Attorney General, on the brief).

PER CURIAM

Respondent D.S.[1] appeals from the October 17, 2023 final agency decision of the New Jersey Department of Children and Families, Division of Child Protection and Permanency (Division) finding he sexually abused his niece, K.L., pursuant to N.J.S.A. 9:6-8.21(c)(3), and placed her at substantial risk of harm pursuant to N.J.S.A. 9:6-8.21(c)(4)(b). We affirm.

I.

On February 9, 2015, the Division received a referral from the Morris County Prosecutor's Office (MCPO) reporting suspected sexual abuse of K.L., who was then sixteen years old, by D.S., her maternal uncle, when she was between the ages of nine and fifteen. On February 6, K.L. disclosed the alleged abuse to her father, G.L. Detective Janet Thai of the MCPO conducted a recorded interview of K.L. during which she reported D.S. sexually abused her at his home in Verona and on family vacations in Wildwood.

---

[1] We use initials to protect a victim or alleged victim of sexual abuse. R. 1:38-3(d)(12).

Because the alleged conduct at D.S.'s home occurred in Essex County, MCPO transferred the case to the Essex County Prosecutor's Office (ECPO). D.S. participated in a recorded interview with Verona Police Detective Sergeant Timothy Banta. He was subsequently indicted for multiple counts of sexual assault and other offenses. The charges were later dismissed on motion of the ECPO.

On June 12, 2015, upon completing its investigation, the Division issued a substantiation letter, concluding D.S. sexually abused K.L. D.S. appealed the decision, and his appeal was transmitted to the Office of Administrative Law. An administrative law judge (ALJ) conducted five days of hearings from August 1, 2018, through August 28, 2019.

A.

K.L. testified at the hearing. The Division also presented the following witnesses: (1) T.L. (K.L.'s mother); (2) G.L.; (3) Detective Sergeant Banta; (4) Division supervisor Jennifer Bourdeau; (5) Detective Thai; and (6) K.L.'s counselor, Denise Lang-Grant.

K.L., who was nineteen years old at the time, testified D.S. had "a sexual relationship with [her]" from 2009 to 2015. It "began when [D.S.] decided to

3

pull [her] aside after dinner at his house with his wife [D]², his [stepdaughter R.G.], and his daughter.  He . . . t[old K.L.] that [her] breasts were developing in the fourth grade."  As a result, K.L. "asked [D] the next day to take [her] to buy training bras because [she] was embarrassed."  D.S. "made it clear what he wanted from [her] shortly after."

D.S. "started [with] simple kissing hello and goodbye on the cheek[, and] he would try and turn and stick his tongue in [her] mouth, those were the first couple of times."  He was "very sneaky" and "always knew when to do what" so family members would not see him.

D.S. made "sexual advances toward" her when they were partners playing hide-and-seek at his home.  When they "would hide in his bedroom upstairs," "[h]e liked to touch, he liked to let [her] touch him, [and] he felt like [she] needed to know what a grown man's body was at [twelve] years old.  He liked to rub [her] feet on his penis until he got an erection."  That happened for the first time "around fifth grade."

He also rubbed her foot against his penis "on his couch . . . [and] . . . living[ ]room floor a few times."  "[T]here were times that

---

² Because D.S. and his wife share the same initials, we refer to her as "D."

[they] were watching movies" together with his family and "he would play under a blanket."  "Anywhere [they] were, he was right next to [her], making sure he had [an] arm's length, foot length, anywhere he just needed to make sure [she] knew and he knew that he could touch [her]."  "[O]nce [K.L.] realized what was happening[, she] made a decision that [she] was[ not] going to say[] anything because she did[ not] want . . . [their] family to be affected."

K.L.'s family, D.S.'s family, and other family members vacationed in Wildwood every July for four or five years and stayed at the same hotel.  When she was fourteen or fifteen years old, they rented kayaks in Wildwood.  K.L. and D.S. were sharing a kayak "facing each other, feet towards each other," and "he scooted forward enough so that his foot c[ould make] contact with [her] vagina and while he was doing that[,] he told [her] that he could make [her] orgasm with his penis."  K.L. told D.S. "he[ is] disgusting."  Her brother and cousins were all in separate kayaks and did not witness the incident.

That night, she "cried to [her] brother that someone needed to help [her] and that was the first time [she] . . . said anything to anybody."  She told her brother D.S. "ha[d] been doing this to her for years."  Her brother "threw up" when she disclosed the abuse.  She told her brother not to tell anyone because she "knew that as soon as [she] said something to the point where [her] parents

5

would find out or . . . [D.S.'s] wife . . . would find out[, her] family would be done and that[ is] exactly what happened." "[A]fter Wildwood was over[, she] decided [she] was[ not] going to come around . . . for anything that was[ not] . . . someone's birthday, [or] a holiday."

K.L. testified D.S. made other sexual advances and "was always trying to touch [her]." D.S. "would put [her] hand in [her] pants and his hand over [her] hand and have [her] play with [herself] . . . under his control." He never touched her vagina directly; it was always using "[her] hand or over [her] pants." "[T]here were times he would ask if [she] liked something, if he was touching [her] if [she] liked it, [and] he would always talk about how hard his . . . penis was and ask [her] if [she] liked that."

He did this "[w]herever [they] were, his house, [her] grandmother's house, Wildwood." At his house, it would occur in "his living[ ]room . . .where [they] spent most of [their] time . . . watching [television]." "Sometimes . . . his wife was an arm's reach away from him."

He would also grab her

> [f]rom behind . . . by [her] hips or like, have his arms
> around [her] arms and just hold [her] there
> and . . . squash [her] butt against his crotch and [she]
> would be . . . full force trying to pull away from him.
> His whole family would be . . . in the kitchen[,] and

6

[he] would release [her] right as someone turned around.

D.S. "exposed himself to" K.L. by "pull[ing] his pants down at any opportunity he could." "[T]here[ are] little alcoves in both [her] house[ and] his house, [and] he would go stand in . . . the alcoves of the wall . . . and . . . whip his penis out." No one saw, and he was only exposing himself to her. "He would wait until people . . . turned around[,] and he always got his penis away in time."

D.S. gave her "alcohol starting in [fifth] grade" when the families were vacationing at her aunt's home near Hunter Mountain. When D.S. gave K.L. her first drink, he asked her, "[d]o you like to party?" "[W]henever he could [he would] give [her] a beer, give [her] a drink in a [s]olo cup trying to sneak it around." G.L. caught D.S. giving her alcohol and pulled "[D.S.] to the side and made it very clear that he should not do that again." Notwithstanding G.L.'s warning, D.S. continued to provide K.L. alcohol. D.S. also bought her "[her] first bowl . . . to smoke marijuana out of" on the boardwalk in Wildwood when she was in seventh grade.

When K.L. "was in eighth grade[, she] started to struggle with [her] mental health[. She] became depressed, . . . had really bad anxiety, . . . was hurting [her]self, . . . did[ not] want to do normal things, . . . did[ not] want to go to

7

school, . . . did[ not] want to hang out with friends, . . . just wanted to lay on the couch and sleep." "[She] became angry[ and] lash[ed] out at [her] parents because [she] was hurting and . . . nobody knew why, . . . so it just came out in anger and [she] struggled for quite a few years, throughout high school."

K.L. began seeing a psychiatrist her freshman year of high school, but did not initially disclose the abuse to her. In "February of [her] sophomore year in high school," she disclosed the abuse to her father. They eventually "agreed as a family to go see the prosecutor." K.L. was interviewed by the prosecutor and disclosed the details of the abuse. She subsequently disclosed the abuse to her psychiatrist who "diagnosed [K.L.] with [post-traumatic stress disorder] from the trauma [D.S.] caused [her] growing up."

On cross-examination, K.L. conceded she may have told "the [p]rosecutor's investigator that [she] . . . asked [her] mother to take [her] to buy bras" instead of her aunt. She said "that [was] a tiny detail that would not surprise [her]." K.L. also conceded she may have testified before the grand jury D.S. pulled her into his lap when they were in the kayak but testified at trial they were sitting across from one another. She "recall[ed] that [they] were facing each other."

8

T.L. testified K.L. "considered [R.G.] her best friend so K.L. . . . [was] always going" to D.S.'s "every few weeks" beginning when K.L. was six years old. "[A]round 2013," K.L. began giving her family "a hard time whenever [they] were going to get together with" D.S.'s family. K.L. "would not want to go," but T.L. would force her to. T.L. did not know what "was motivating [K.L.] to not want to spend time with [D.S.'s] family."

On one occasion in 2013, K.L. was spending the night at D.S.'s house because T.L. was away at a conference. K.L. did not want to spend the night, but T.L. was going to be away and her father needed to take their son to play lacrosse. The next morning, K.L. called T.L. before 8:00 a.m. and demanded to be picked up. T.L. drove to D.S.'s house and saw K.L. on the porch, distraught without shoes. K.L. was "extremely distressed, . . . yelling, screaming, [and] cursing. When [T.L.] spoke with D.S.[, she] was under the impression . . . he threw [K.L.] out of the house because she was cursing so much[,] and his kids were crying."

While driving home, K.L. "was still extremely agitated to the point . . . she kept saying to [T.L.] to drop her off at her friend's." T.L. "got scared" because "something was wrong." K.L.'s parents "tried to talk to her" but "did[ not] really get anything out of her." Hours later, K.L.'s brother

9

informed T.L. that K.L. "cut her arms from her wrists to her under arms." He showed T.L. a photograph of K.L.'s injuries on his phone. That same night, T.L. took K.L. to the hospital, and she was discharged three days later.

From May to September 2013, K.L. participated in weekly therapy sessions, but her depression and anxiety worsened. Her therapist recommended K.L. begin seeing a psychiatrist, and she thereafter began treating with one.

K.L. went to Wildwood in the summer of 2014. T.L. and her husband did not go for the entire time. K.L. "did not want to drive with" D.S.'s family and drove in another vehicle. K.L. called her family asking, "if [they] would come earlier" than planned because "she[ was] just not liking the company" and "was[ not] having a good time."

On February 6, 2015, T.L. learned D.S. had sexually abused K.L. When she arrived home, G.L. met her in the garage, and told her "[y]our brother-in-law . . . has been molesting [K.L.] since she was nine years old." After disclosing the abuse, K.L. "got very angry. Her behavior started to become very reckless. She did[ not] want to spend time at home with [her family,] and [they] were basically playing the chasing game trying to make sure she was okay all the time." T.L.'s sisters stopped talking to her, and K.L.'s cousins "blocked [K.L.]" on social media. In March 2015, T.L. attempted to discuss the matter

10

with D, but she "did[ not] want to hear it." T.L. only speaks to her mother now and has not spoken with her sisters since K.L. disclosed the abuse.

G.L. testified he had "issues with D.S. before . . . [K.L.] disclosed [the] sexual abuse." The "first [issue] was when [he] caught [D.S.] giving [K.L.] vodka when she was [twelve] years old at a family vacation [in] Hunter Mountain . . . . [He] explained to [D.S.] if he ever gave [K.L.] any alcohol again[,] it would probably be his last day." The other incident involved D.S. purchasing a marijuana pipe for K.L. when she was a preteen.

On February 6, 2015, K.L. was experiencing "just another day of her depression . . . . [S]he would[ not] get out [of] bed, she would[ not] go to school[,] and [G.L.] went into her [room] and . . . said, . . . 'something is bothering you . . . [y]our family is there for you all the time.'" K.L. responded, "[o]h really my family?," "[i]f family is so important why would somebody try to hurt me?" "[T]hat[ is] when she let [him] know that she was being assaulted by her . . . uncle."

K.L. "always went into depression" when "she came home from spending any kind of time with" D.S.'s family. G.L. noticed a change in K.L.'s behavior when she "really started to go in her room a lot," around age eleven. He did not

11

"suspect any kind of link between K.L.'s periods of depression and the time . . . she spent at [D.S.'s] home," thinking she was "hormonal."

G.L. "never noticed . . . anything noteworthy about [D.S.'s] relationship with K.L." When K.L. was on vacation with D.S.'s family, she "would call [G.L.] every day." The last time she went with them in July 2014, she called and said "[d]ad can you please com[e] rescue me?" He understood that to mean she "had enough of being with . . . [t]he whole family," "but unfortunately[, he] was incorrect."

Detective Seargent Banta interviewed D.S. on April 15, 2015. A video recording of the interview was played for the ALJ and entered into evidence. D.S. conceded he played hide-and-seek with K.L. at his residence and sat in a hot tub with K.L. and other family members during a family vacation in Wildwood. He denied "putting [his] foot in between [K.L.'s] legs, [or] anywhere in the area of her vagina" while together in the hot tub.

D.S. recalled they "rented boats . . . two seasons" but denied "pulling [K.L.] very close to [him], [or] talking sexually in [K.L.'s] ear" while they shared a kayak. He denied "[g]iv[ing] her] a kiss with [his] tongue," "[p]urposely showing [his genitalia] to her," "instruct[ing] her to rub his penis," or "rubb[ing] her vagina."

D.S. asked Detective Seargent Banta "what[ is] the chance . . . this happened around somebody else?  Someone else is doing this to her, within her household?"  He also described K.L. as "a care package.  She always came with special instructions . . . ."  Detective Seargent Banta described D.S.'s demeanor as "defensive or deflective."  Based on his experience as a detective, Detective Seargent Banta felt "something occurred."

Bourdeau was a supervisor for the Division's intake unit.  On February 9, 2015, the Division initiated an investigation into K.L.'s case after it received a referral from the MCPO.  K.L. told Detective Thai "that she, from the ages of [nine] until . . . [fifteen], . . . was being sexually abused by her uncle."  K.L. also told Detective Thai D.S. "digitally penetrated her, and that he touched her around her vagina.  He had stuck his tongue down her throat.  And . . . he had her rub his penis up and down."

A Division worker interviewed K.L.'s parents, and her counselor, Lang-Grant, who believed K.L. was sexually abused.  Upon completion of its investigation, the Division issued a substantiation letter, concluding D.S. sexually abused K.L.

Detective Thai interviewed K.L. on February 9, 2015.  K.L. stated the

13

incidents started . . . occurring . . . [between] the years of [nine] to . . . [thirteen] years old . . . . Her mother allowed her to sleep over at her cousin's house. . . . [W]hen she was there and sleeping over, it was just her. She was with her cousins, [D], and [D.S.].

. . . [T]here were inappropriate comments . . . made to her. Very sexualized in nature. . . . [T]he first incident that occurred [was when D.S.] . . . comment[ed] to her . . . "[D.S.] can see [her] breasts developing." . . . .

In addition to sexualized comments . . . , [D.S.] . . . would grab her physically, around the hip[,] and pull her close to his body. And her body would make contact with his penis. Additionally, . . . [D.S.] would kiss her and put his tongue in her mouth. . . . There are times, during the sleep[]over, they would . . . be in a room. [D] would be present. Her cousins were present. But [D.S.] would sit next to her, while they were watching a movie, take her hand[,] and place it on her vagina, under her clothes, and then take his hand and place it over hers, and . . . move it around . . . .

. . . At her own residence[,] . . . [D.S.] exposed his penis to her. And then, on vacation, when they were in Wildwood, . . . they were in the hot tub, and [D.S.] placed his foot in between her legs on her vagina.

Lang-Grant is a licensed professional counselor and testified as an expert in counseling specializing in trauma and sexual abuse. She treated K.L. from May 2015 through February 2016, for "rape trauma syndrome. Which is consistent with post[-]traumatic stress disorder." "[K.L.] presented with

nightmares, flashbacks, a mood disorder, [an] eating disorder, sleeping problems, increased anger, difficulty concentrating, general responsiveness, [and] hyper-vigilance. She was really a classic textbook case of rape trauma syndrome."

Lang-Grant did not "have any concern that [K.L.] had provided a delayed disclosure regarding the abuse" because "children usually do[ not] disclos[e] for quite a while," "[e]specially if the abuser is someone in their family and someone that they trust." She did not believe K.L. was "unreliable in her disclosure, mainly because of the emotion that was attached to it. And more than her difficulty with processing what happened to herself, she was more concerned, at times, about the impact it had on her extended family." K.L. never recanted her allegations against D.S.

B.

D.S. testified in his defense. He also presented the following witnesses: (1) S.V. (K.L.'s aunt); (2) B.V. (K.L.'s uncle); (3) N.G. (K.L.'s uncle); (4) D; and (5) R.G. (K.L.'s cousin and D.S.'s stepdaughter).

S.V., B.V., and N.G. testified consistently the families were always together, including on holidays, birthdays, and family vacations. The families vacationed in Wildwood every July for several years. They would generally

15

stay for one week. K.L. and her brother would stay the entire time, but T.L. and G.L. would not. They would come for a day or two and then leave for their own vacation with K.L. and her brother.

S.V. testified the hot tub in Wildwood was "not very large," circle shaped, "[twelve] feet" in diameter, and "could fit a good [fifteen], [twenty] people . . . at the same time." "If someone were sitting on one side of the [hot tub], [it] would [not] be possible, with their feet, to reach the . . . opposite side of the [hot tub]." "[Y]ou [were] able to see to the bottom of the [hot tub]" when "there were[ not] bubbles . . . . [T]he bubbles kind of came up the back." "And if anyone were trying to reach across the [hot tub,] it would be noticeable" because it was "a very out in the open kind of pool."

D.S. was never alone with K.L. in the hot tub because the families "were . . . always together. And [K.L.] was always with [R.G.]. If one was one place, the other one was right next to [the other]. They were never apart." K.L. and D.S.'s family "would always be together."

S.V. never observed D.S. alone with K.L. at family gatherings and never saw him kiss her in a way she felt was inappropriate. It would not have been possible for D.S. to expose himself to K.L. without being seen. She was never present at D.S.'s home when K.L. slept over.

16

B.V. testified it would not have been possible for D.S. to expose himself to K.L. without being seen in any of the homes they gathered in. The hot tub in Wildwood was "like a diamond" and "probably [ten] f[eet] across." It would not have been possible for D.S. to "sit across . . . from [K.L.] and reach her with his feet." He conceded it is possible D.S. "might have been sitting in one corner and [K.L]. in a corner opposite to him." He never saw D.S. kiss K.L. on the mouth. He only saw K.L. on vacation and at family gatherings, and he was not present when she slept at D.S.'s home.

N.G. never saw D.S. kiss K.L. on the mouth or in a way he found objectionable. It would not have been possible for D.S. to have exposed himself to K.L. without being seen by others in any of the homes they gathered in. He was never present when K.L. slept over at D.S.'s home.

The hot tub in Wildwood was "fairly big" and shaped "[a]lmost like a triangle." It was "probably about [twelve] by . . . [ten] . . . , [twelve] by [fifteen feet]." There was "[t]oo much distance" for D.S. to have reached his foot across and touched K.L. The hot tub was clear "like a pool," and if he had attempted to do something like that, it would have been apparent to other people.

D never observed D.S. kiss K.L. on the lips. It would not have been possible for D.S. to expose himself to K.L. in the kitchen at her mother's house

17

or "in the various kitchens" without others seeing because "there were always people around in the kitchen."

The hot tub in Wildwood was shaped "like a diamond." She observed D.S. in the hot tub with K.L. They "were all in the [hot tub], pretty much. In and out of the [hot tub] constantly." It would not have been possible for D.S. to sit across from K.L. in the hot tub and reach her by extending his legs "without anybody noticing it. Like he was stretching his foot or whatever."

D testified the families went kayaking in Wildwood once, in 2011. She sat on the dock taking photographs. Initially, K.L. was in a kayak with R.G. At some point, K.L. got into a kayak with D.S. D was not close enough to hear them and did not hear what transpired that "resulted in a change in the seating arrangements."

Two photographs were entered in evidence showing D.S. and K.L. sharing a kayak on July 29, 2011, with K.L. in the front seat and D.S. in the back seat. D.S. was seated "[m]aybe [four] feet" behind K.L.'s front seat, and it was not "possible for anyone to sit facing each other in [the] kayak." She did not see D.S. "lean forward and touch [K.L.]" or "whisper to her."

K.L. would visit her house to spend time with R.G. "sometimes from Friday night to Sunday," once or twice a month. D never saw D.S. grab or hug

18

K.L. tightly. There were times when she was not present in the room when D.S. was with K.L.

Her family and K.L. would watch movies together "in the den." In "[t]here was a sofa . . . along the windows . . . . It had three cushions across. And there was a smaller couch, which was like a love-seat couch . . . ." "[E]verybody just kind of sat wherever . . . on the couches." She did not recall any occasion when D.S. and K.L. sat next to each other or if "there was a blanket draped over both of them."

K.L. also went shopping with D and her family. D "bought [K.L.] her first bras. Not [her] sister."

R.G. never observed D.S. kiss K.L. on the mouth. At family gatherings, it would not have been possible for D.S. to expose himself to K.L. without others seeing him.

The hot tub in Wildwood was "big," and it would not have been possible for D.S. and K.L. "to sit across from one another . . . in a way that [D.S.'s] foot could have reached [K.L.]." It would have been "very noticeable" if he did. She conceded "it[ is] possible that they could have . . . been in the hot tub together. But [she thought] it[ is] more likely that even more of [the family] were there as well."

19

R.G. recalled they went "kayaking a couple of years" in Wildwood. She identified the photographs of the group kayaking in 2011 and recalled K.L. "was bothering [her] and decided . . . she wanted to leave [her] kayak" and "went into [D.S.'s]" kayak. She did not hear D.S. say anything inappropriate to K.L. and did not see him lean forward and whisper to K.L.

K.L. was her best friend and visited her house once or twice a month to "sleep over for the weekend." They played hide-and-seek "in teams" with D.S. and R.G.'s younger sister, but she could not recall whether K.L. and D.S. were partners. During the sleepovers, her family and K.L. watched movies together, and "it[ is] possible that [K.L.] sat next to [D.S.] during a movie." She did not recall them ever sitting with a blanket covering them.

D.S. denied kissing K.L. on the mouth or forcing his tongue into her mouth. He recalled being in the hot tub in Wildwood with K.L. but denied putting his foot between her legs in the hot tub. D.S. did not "remember . . . specifically" if he was ever alone in the hot tub with K.L. He denied making any comments of a sexual nature to K.L. or whispering to her while they were kayaking together. It would not have been possible to "lean in close and touch her" or "put [his] foot between [K.L.]'s legs" because the seats in the kayak "act[ed] as a barrier."

20

D.S. denied ever exposing himself to K.L. He recalled playing hide-and-seek with K.L. but denied ever touching her in a sexual manner or having her touch him. D.S. also recalled watching movies at his home when K.L. slept over and conceded he "[p]ossibly" sat next to K.L.

### C.

The parties filed post-hearing written summations, and the record was initially closed on January 1, 2022. "[O]n August 19, 2022, the record was re-opened for further review of the hearing transcripts and the audio [and] video recordings submitted as evidence. Following an extensive review of the record, along with the audio and video recordings submitted in evidence, the record closed on June 23, 2023."

On July 20, 2023, the ALJ issued his initial decision supported by a written opinion. He found "the testimony of S.V., B.V., and N.G. truthful and credible as to [their] personal observations and description of events concerning the interactions between D.S. and K.L. in family gatherings."

> However, to the extent that [their] testimony . . . sought to corroborate D.S.'s denial of all of the allegations made by K.L., [he found their] testimony . . . not useful in rebutting the allegations of sexual abuse . . . as they either were not privy when the alleged acts occurred, or they simply did not witness the interactions leading to the allegations.

The ALJ found "T.L[.] and G.L[.] provided credible and frank testimony concerning their family dynamics with K.L. as they testified to K.L.'s positive attributes as well as her struggles with mental illness and substance abuse, which corroborated K.L.'s testimony of the same." Their testimony "was consistent with their statements to the MCPO and the Division, regarding the allegations made by K.L." They "provided a candid self-assessment and acknowledgement that they were not aware of [the] alleged abuse of K.L., which . . . demonstrates an honest testimony that is credible." The ALJ also found the testimony of Detective Thai, Detective Sargent Banta, Bourdeau, and Lang-Grant credible.

The ALJ found K.L.'s testimony "to be overall credible, as it was consistent with her initial disclosure to her father, her statements to the MC[P]O, and her therapy statements to Lang-Grant." He found, "K.L.'s ability to recall the alleged sexual abuse[] that occurred between the ages of [nine] and [fourteen] and her admission that she did not reveal the same to her parents and family so as not to break up the family [w]as believable and coherent." Her "demeanor and clarity in describing the sexual abuse allegations and her testimony reflecting on why she allowed the same to occur . . . further demonstrat[ed] . . . her believability as a witness."

The ALJ concluded D.S.'s testimony was not credible. His testimony was

22

not sincere and lacked frankness. [It] seemed prepared and rehearsed in addressing the allegations made by K.L. . . . .

. . . The record supports [that] finding. For example, D.S. did not deny being with K.L. at any of the locations she . . . alleged to have [been] sexually abused [by] D.S. He confirmed . . . he was present when K.L. attended family vacations in Wildwood without her parents being present for the entire week[. W]hile on vacation, D.S. played with the children in the Wildwood pool and sat with K.L. and the rest of the family in the [hot tub]. D.S. and K.L. shared a kayak on at least one occasion, and . . . was present when K.L. visited his home and they watched [movies together] . . . .

. . . [M]ost compelling in [the court's] assessment [that] D.S. lack[ed] . . . credibility are his statements to [Detective Seargent] Banta[. W]hen he asked "what[ is] the chance . . . this happened around somebody else? Somebody else is doing this to her, within her household[?]" . . . [A]nd [when he stated] . . . K.L. was not "special[,] but unique," like a "care package" that came with special instructions. These statements by D.S. demonstrate a lack of empathy and . . . self-righteous[ness] in seeking to blame K.L.'s parents as responsible for her abuse . . . .

The ALJ concluded "the Division . . . met its burden [of] proving that K.L. was sexually abused by [D.S.] in accordance with N.J.S.A. 9:6-8.21(c)(3)." He found

K.L. provided detailed credible testimony concerning the incidents of sexual abuse by D.S. that took place

23

from the time she was [nine] until she was [fourteen] years old, at which she disclosed to her father. While K.L.'s testimony may not have been consistent in detail with the prior statements and disclosures she made to her parents, the MC[P]O, and Lang-Grant, . . . she provided testimony of the salient facts of the allegations made herein.

For example, the bulk of K.L.'s testimony is consistent with the testimony of her family members, and even D.S. The family members collectively affirmed that K.L. was very close to R.G. and spent a significant amount of time at D.S.'s home in Verona. They confirmed K.L. attended family vacations in Wildwood without her parents being present for the entire week. While on vacation, D.S. played with the children in the pool and sat with K.L. and the rest of the family in the [hot tub]. D.S. and K.L. shared a kayak on at least one occasion. Each family member confirmed they are now estranged from K.L.'s family, following her disclosure to her parents. Moreover, K.L.'s testimony was fully subject to cross-examination at hearing and remained consistent therein.

On October 17, 2023, the Division issued its final decision "adopt[ing] the ALJ's initial decision." It concluded "D.S. placed K.L. at substantial risk of sexual abuse pursuant to N.J.S.A. 9:6-8.21(c)(4)(b)," and "the finding of sexual abuse [was] affirmed."

On appeal, D.S. argues: (1) the decision "must be overturned because it is based solely on uncorroborated testimony that was contradicted by impartial witnesses"; (2) the decision "improperly used D.S.'s testimony as corroboration

24

of K.L.'s testimony without addressing the fact that such corroboration equally supports D.S."; and (3) "the length of time from testimony to decision makes the reliance on demeanor credibility determinations inappropriate."  We address these arguments in turn.

## II.

Our scope of our review of a final agency decision is limited.  N.J. Dep't of Child. & Fams. v. E.L., 454 N.J. Super. 1, 21-22 (App. Div. 2018); see also In re Stallworth, 208 N.J. 182, 194 (2011).  "[A]n appellate court reviews agency decisions under an arbitrary and capricious standard."  Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019) (citing In re Stallworth, 208 N.J. at 194).  "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'"  Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

In determining whether an agency action is arbitrary, capricious, or unreasonable, we consider "(1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the

A-1204-23

administrative agency clearly erred in reaching its conclusion." Conley v. N.J. Dep't of Corr., 452 N.J. Super. 605, 613 (App. Div. 2018) (citing In re Stallworth, 208 N.J. at 194). "The burden of proving that an agency action is arbitrary, capricious, or unreasonable is on the challenger." Parsells v. Bd. of Educ. of Somerville, 472 N.J. Super. 369, 376 (App. Div. 2022) (citing Bueno v. Bd. of Trs., 422 N.J. Super. 227, 234 (App. Div. 2011)).

"[A]n appellant carries a substantial burden of persuasion, and the agency's determination carries a presumption of reasonableness." Dep't of Child. & Fams. v. C.H., 414 N.J. Super. 472, 479-80 (App. Div. 2010) (citing Gloucester Cnty. Welfare Bd. v. State Civ. Serv. Comm'n, 93 N.J. 384, 390-91 (1983)). "We extend substantial deference to an 'agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible' based on the agency's expertise." N.J. Dep't of Child. & Fams. v. R.R., 454 N.J. Super. 37, 43 (App. Div. 2018) (quoting In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489-89 (2004)).

"[I]f substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575,

26

587 (1988)). "[A] reviewing court . . . will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein." De Vitis v. N.J. Racing Comm'n, 202 N.J. Super. 484, 489-90 (App. Div. 1985) (citing In re Tenure Hearing of Grossman, 127 N.J. Super. 13, 23 (App. Div. 1974)).

"Appellate courts owe deference to the trial court's credibility determinations . . . because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). The deferential standard is applied "because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020) (citing State v. Elders, 192 N.J. 224, 244 (2007)).

"Title [nine] controls the adjudication of abuse and neglect cases." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material[,] and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)).

27

N.J.S.A. 9:6-8.21(c)(3) provides "'[a]bused or neglected child' means a child less than [eighteen] years of age whose parent or guardian, as herein defined, . . . commits or allows to be committed an act of sexual abuse against the child." "Sexual abuse" is defined as "contacts or actions between a child and a parent or caretaker for the purpose of sexual stimulation of either that person or another person." N.J.S.A. 9:6-8.84. It includes "the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct;" as well as "sexual penetration and sexual contact as defined in N.J.S.[A.] 2C:14-1 and a prohibited sexual act as defined in N.J.S.[A.] 2C:24-4." N.J.S.A. 9:6-8.84(a), (c).

N.J.S.A. 9:6-8.21(c)(4)(b) provides that a child is considered "abused or neglected" if the child is less than eighteen years of age and

> [the child's] physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [their] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . ; or by any other acts of a similarly serious nature requiring the aid of the court.

28

The "minimum degree of care" element in subsection (c)(4) reflects "the intermediary position between simple negligence and the intentional infliction of harm." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017) (citing G.S. v. Dep't. of Hum. Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 179 (1999)). Upon considering the totality of the surrounding circumstances and assessing each case on its facts, the court must determine whether the parent or "guardian fail[ed] to exercise a minimum degree of care when [they are] aware of the dangers inherent in a situation and fail[ ] adequately to supervise the child or recklessly creates a risk of serious injury to that child." Ibid. (quoting G.S., 157 N.J. at 181).

We are satisfied the Division's findings that D.S. sexually abused K.L. and placed her at substantial risk of harm are amply supported by substantial credible evidence in the record. K.L. testified D.S. sexually abused her repeatedly for years. The ALJ determined her allegations of abuse were credible and consistent with her prior statements to law enforcement, her counselor, and her parents. He also found D.S.'s testimony was not credible. The ALJ's credibility findings are entitled to our deference because he had the opportunity to see and hear the witnesses who testified. Cige, 240 N.J. at 595. Based on our review of the

29

record, there is no reason to disturb the ALJ's findings or the Division's final decision based on his findings.

We are not persuaded by D.S.'s claim K.L.'s testimony was contradicted by impartial witnesses. D.S.'s witnesses were anything but impartial. They were all close family members with a vested interest in the case. Moreover, as the ALJ aptly noted, none of the witnesses were present for all the alleged incidents of abuse. As he determined, accepting their testimony as credible did not preclude a finding D.S. sexually abused K.L. as she alleged.

The ALJ acknowledged there were certain discrepancies in K.L.'s statements. For example, she testified D bought her first bra, but previously indicated to law enforcement her mother did. She also initially reported to law enforcement that she and D.S. were facing forward in the kayak and D.S. pulled her into his lap, but testified at the hearing they were facing each other, and he placed his foot in her crotch. We are satisfied the ALJ appropriately considered these minor discrepancies in making his overall credibility findings.

D.S.'s contention the Division's decision was arbitrary and capricious because the ALJ "did not explain the rejection of documentary evidence" lacks merit. There is no requirement that a fact finder specifically address every piece of evidence in the record. The ALJ engaged in a comprehensive analysis of the

testimony and documentary evidence. There is no basis to conclude he failed to consider any relevant evidence in reaching his decision.

We are unconvinced by D.S.'s argument the photographic evidence disproves K.L.'s claims. To be sure, the photograph of K.L. and D.S. in the kayak in 2011 shows they were facing the same direction contrary to her testimony at the hearing. However, both D.S. and R.G. indicated they rented kayaks on more than one trip to Wildwood. K.L. testified the kayak incident occurred when she was "fourteen or fifteen." She was eleven years old in July 2011 when the photograph was taken. The photograph from 2011, therefore, does not conclusively establish K.L.'s testimony regarding the configuration of the kayaks was mistaken.

D.S. emphasizes the testimony from various witnesses regarding the size and shape of the hot tub and the photographs of the hot tub entered in evidence. Again, however, that evidence does not conclusively disprove K.L.'s claim D.S. touched her with his foot in the hot tub as she reported to law enforcement.

D.S.'s remaining claims lack sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(1)(E). It was not improper for the ALJ to find K.L.'s testimony was corroborated by D.S.'s testimony even though he found D.S.'s denial of K.L.'s allegations incredible. There is no basis to

31

conclude the passage of time interfered with the ALJ's ability to determine credibility based on the demeanor of the witnesses. He had the opportunity to see and hear the witnesses when they testified and extensively reviewed the entire record before issuing his decision.

To the extent we have not specifically addressed any of D.S.'s arguments, it is because we are satisfied the Division's decision is supported by sufficient credible evidence on the record as a whole. R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1204-23